## Leas v. Garverich *et al.*

Tax Title: FRAUD IN OBTAINING: SUBSEQUENT PURCHASER WITH NOTICE : EQUITABLE REDEMPTION. Defendant, believing that the title to his land was uncertain, and that it might be strengthened by a tax title, allowed it to go to tax sale and deed, under an arrangement with one W. that he should buy it and take a tax deed, and afterwards convey it to defendant. W. did buy it at tax sale, but he assigned the certificate to his brother M., which fact was concealed from defendant until after M. had taken a deed, and defendant had paid W. the amount necessary to redeem the land ; after which W. removed from the state, and left defendant at the mercy of M. The evidence (see opinion) justifies the conclusion that W. and M. conspired together to cheat defendant through the confidence which he had reposed in W., who seems to have been a somewhat intimate friend of defendant. The land was sold at tax sale for $51.35, and is shown to be worth seven thousand dollars. M. refused to convey it to defendant unless he would pay him two thousand dollars. About one year later M. sold the land to plaintiff, through plaintiff's attorney, who had full knowledge of the fraud, for sixteen hundred dollars,—five hundred dollars of which was to be paid to the attorney as a fee for recovering possession of the land, which plaintiff knew was occupied by defendant, or some one, adversely to the title which he was purchasing. *Held*—

(1) That the tax title in the hands of M., was void for fraud, and that it could not prevail against defendant's title.

(2) That plaintiff was bound by his attorney's knowledge of the fraud, and therefore he acquired by his purchase no better right than M. had.

(3) That if it were conceded, as claimed by plaintiff, that the attorney was not at the time of the purchase his attorney or agent, yet the circumstances of the transaction were such as to put plaintiff upon inquiry as to defendant's equities, which would have led to a full knowledge of the fraud, and that therefore he must be charged with such knowledge.

(4) That since the evidence shows that W. was at least the agent of M. in all matters pertaining to the tax purchase and redemption, he had authority to bind M. by the receipt of the redemption money from defendant, and to contract that redemption should be made in a manner and at a time different from that prescribed by statute. And M. having thus received the money which he agreed to accept in discharge of his tax title, pursuant to a valid agreement before entered into, equity will not permit that title to be enforced against defendant. (See *Shoemaker v. Porter*, 41 Iowa, 197.)

Leas v. Garverich,

*Appeal from Keokuk Superior Court.*—HON. HENRY
BANK, JR., Judge.

FILED, MAY 9, 1889.

ACTION in equity to recover the possession of and
quiet the title to certain lands. The defendants, in
their answer, set up title to the lands, and pray that it
be quieted in them. There was a trial on the merits,
and a decree dismissing plaintiff's petition and quieting
the title in defendants. Plaintiff appeals.

*J. T. Smith,* for appellant.

*Craig, McCrary & Craig,* for appellees.

BECK, J.—I. The defendant Garverich has for a
great many years occupied and cultivated the land in
controversy (one hundred and sixty acres) as a farm and
homestead. He failed purposely to pay the taxes upon
it for one year, and permitted it to be sold at tax sale,
believing that he could thereby acquire a tax title which
would strengthen his right to the lands. He unwisely
believed that his title possibly might not be perfect, as
the land was a part of the Half-Breed tract, the title
of which had been for a long time unsettled and in liti-
gation; but at this time it was generally understood to
be good. The land was accordingly sold, and a treas-
urer's deed executed, under the circumstances hereafter
disclosed. Plaintiff claims under this tax deed, and
defendants claim under the Half-Breed title, which has
its origin in a grant by the United States government.
It is presumed that defendant has learned by experi-
ence, too late to keep him from trouble in this case, but
which may impart wisdom to be used in future trans-
actions, that it is safer to trust to the Half-Breed title
unsupported, than to imperil the title of his land by
permitting a tax title to be acquired by a friend, trust-
ing in his promise to convey such title to him. It is not
denied that defendant's title to the land is valid unless

Leas v. Garverich.

it be defeated by plaintiff's tax title, and it may be assumed that the tax title, as disclosed by the records, is regular and valid, unless it be defeated by fraud which defendant insists was practiced by plaintiff and his grantors, whereby defendant was induced to permit a tax deed to be executed without redemption, under a promise that the tax title would be transferred to him. The questions for our determination involve the validity of the tax title held by plaintiff.

II. We will proceed to state briefly the facts disclosed by the evidence, and the conclusions to which they lead us. Defendant, probably without sufficient reason, believed that the title to his lands was uncertain, and might be strengthened by a tax title. We are authorized to infer that, as there had been, in former years, litigation in regard to the tract of which the land is a part, defendant's belief and purposes were honestly entertained. He knew that a notice would be served upon him just prior to the issuing of the tax deed. He depended upon this notice to advise him when to act in order to secure a tax deed pursuant to his plan. The notice, in due time, was served upon defendant, while he was employed threshing his grain with a machine, by W. J. Medes, whom defendant knew quite well. He was a lawyer, an insurance agent, and had been the county superintendent of schools. He had quite often shared in the hospitality of defendant, by taking dinners and staying over night at defendant's house when he was in the neighborhood attending to school business and (using his own language) "looking after voters." We are authorized to infer that he and defendant were political friends, and probably of the same political party. Defendant testifies that he informed Medes of his purpose in permitting the land to be sold for taxes, and requested him to take a deed in his own name, and afterwards to transfer the title to plaintiff. He proposed to pay the money necessary for redemption at or about the time the right of redemption should expire. Medes promised to comply with defendant's request, and declared that it was not necessary that payment

should be made on or before the day the right of redemption expired, but if made soon afterwards it would be good. This agreement was distinctly and plainly stated by the parties, according to defendant's testimony. But Medes testifies that no such arrangement was made. Defendant is to an important extent corroborated by a witness, who was present, and heard a small part of the conversation. While the corroboration extends to but a few words of conversation heard by the witness, wherein Medes promised to comply with the request of defendant, it is quite important, and really gives great support to defendant's evidence. This request was connected in the conversation with the notice of redemption served by Medes. This notice was in the name of a brother, H. W. Medes, to whom the other Medes had assigned the tax-sale certificate. Defendant declares that he had no knowledge that any other person than W. J. Medes held the certificate. He knew the last-named by the name of "Will," and he supposed the notice was given by him, and did not know that H. W. Medes was interested in the transaction. He had no different knowledge until after the deed was made, and the fact disclosed to him that his confidence in his friend had seriously imperiled his valuable farm and homestead. The evidence shows that W. J. Medes had bought the land at tax sale, and transferred the certificate to his brother, H. W. The former testifies that in serving the notice he acted as the agent of the latter. Defendant swears that he had no knowledge of these things. About the time the right of redemption expired, defendant testifies that he called upon W. J. Medes, to make redemption from the tax sales, and paid him the amount required to redeem. He was informed by W. J. Medes that the certificate was in possession of his brother, H. W., at Fairfield, who would soon come to Keokuk, where the former lived, and the two would then visit defendant and close the transaction. This promise and arrangement are denied by W. J. Medes; but he does not, directly or indirectly, deny that defendant paid him the money at the visit

Leas v. Garverich.

for the redemption. W. J. Medes was about to remove from the state, and the next day after the visit did leave, and defendant has never since seen him. He and his brother both testify that his brother's money was paid upon the tax purchase, and that he was merely the agent of the brother in all transactions connected with the matter. Instead of the two brothers visiting defendant to settle the tax-sale redemption matter, H. W. went alone, and informed defendant that his brother had removed, and had no interest in the matter, and never had ; that he held the certificate, and would convey the land to defendant for two thousand dollars, rather.than sell it to others. The land was sold at tax sale for $51.35, and is shown by the evidence to be worth more than seven thousand dollars. In about one year after this H. W. Medes conveyed the land to plaintiff, under these circumstances. The agent of H. W. Medes, having charge of this tax-title matter, was an attorney, and was employed by plaintiff in some legal business. Through him the interest of Medes was sold to plaintiff for eleven hundred dollars, the attorney to receive five hundred dollars additional as his fee for recovering possession of the land. Plaintiff knew that the title he was purchasing was a tax title ; that the land was held adversely by the other claimant, who was resisting the tax title ; that he was to pay a fee of five hundred dollars to recover possession of the land,—thus being informed that there was an adverse claimant, who would make a vigorous resistance to the enforcement of the tax title. The plaintiff knew that the attorney with whom he bargained as an agent knew all the facts connected with questions affecting the validity of the tax title. He testifies that he relied upon the attorney's knowledge and information as to these matters. He knew that the land was occupied by defendant, or some one else, adversely to plaintiff's title. The fact that he agreed to pay five hundred dollars for recovering possession and settling the title by an action authorizes these conclusions of fact. The attorney knew all about the tax title. He had been agent and attorney for H. W.

Medes, and had himself held a tax-sale certificate on another tract of land owned by defendant, from which redemption was required about the time it was to be made on the tax sale in controversy. Defendant was in the attorney's office, on business connected with these tax matters, at the time these redemptions were made. We are surely authorized to infer that the attorney had full knowledge of defendant's claim and the fraudulent act whereby he was induced not to make redemption before the time for the execution of the deed had arrived. If the tax-title was honestly and fairly obtained, and was valid, it cannot be credited that this attorney would have bargained the land to plaintiff for eleven hundred dollars and his fee of five hundred dollars, when it was well worth more than seven thousand dollars. All the transactions by which the tax title was acquired and conveyed to plaintiff have the offensive odor of fraud, which always arises when simple-minded and confiding men are inveigled out of their lands and other property. We entertain no doubt that H. W. and W. J. Medes conspired together to defraud defendant, and that the attorney had knowledge of the facts in the case. Indeed, the evidence is direct and positive that he had full information of the fraud of the Medes before the deed to plaintiff was made. This information was imparted in more than one conversation between the attorney of defendant and the attorney just referred to.

III. Let it be assumed that W. J. Medes was H. W. Medes' agent. If so, he had full power to receive redemption money and make contracts as to the time and condition of payment. His principal, H. W., is chargeable with knowledge of and responsibility for the frauds of the agent. On this point there can be no doubt. The evidence is uncontradicted that W. J. Medes received the redemption money from defendant. As we have said, he had authority, as agent of his brother, to make contracts in regard to the redemption and receive the money paid therefor. It is, then, a case of redemption from the holder of the tax certificate

or deed pursuant to an agreement before made. , That the parties could agree to extend the time of redemption, and that it could be made by payment to the holder of the tax certificate, cannot be doubted. See *Shoemaker v. Porter*, 41 Iowa, 197. Let it be admitted that the redemption was not made in the manner or at the time prescribed by the statute. It nevertheless is regarded by equity as a redemption which will defeat the tax title. The holder of that title received the money he agreed to accept in discharge of his tax title, pursuant to a valid agreement before entered into between the parties. Equity will not permit that title to be enforced against defendant.

IV. Plaintiff endeavors to show that the attorney of whom he bought the land was not at the time his attorney or agent, and only became so after he purchased the land under an agreement made before that event, fixing his compensation, etc. We are not prepared to assent to plaintiff's view, but, for the purpose of the case, we may here concede its correctness. But if plaintiff is not bound by the knowledge of the attorney, for the reason assigned, he was surely put upon inquiry as to the defendant's equities by the facts we have recited and the knowledge he did possess. He was buying lands worth seven thousand dollars. He says he was informed they were worth two thousand dollars or three thousand dollars. They were in adverse possession of defendant, or some one else, who would contest the title vigorously, —so vigorously that a fee of five hundred dollars was thought but a just compensation to be paid to the attorney for his services in that behalf. Surely plaintiff will be charged with knowledge of defendant's claim, when he could have obtained it by simply inquiring of the attorney as to the facts, or by going upon the land, and inquiring of the defendant, the person in possession. Inquiries in these directions, suggested by the facts of which plaintiff had knowledge, would have revealed to plaintiff that defendant made a *bona-fide* claim that the tax title was, as to him, fraudulent, and could not be enforced. Equity will regard plaintiff

as chargeable with notice of all the rights and equities of defendant

V. We reach the conclusion that plaintiff cannot in equity enforce his tax title, which is void on account of fraud, and that defendant is entitled to the relief prayed for in his cross-bill, quieting his title, and setting aside the tax deed, etc. The decree of the district court accords with these views. It also prescribes the amount to be paid by defendant to redeem from the tax sales. No objection is urged as to this provision of the decree. We are not, therefore, called upon to more particularly consider it. The decree of the superior court will be in all respects AFFIRMED.